IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ROGER WALLACE,<br><br>            Plaintiff,<br><br>vs.<br><br>WILLIAM R. MATHIAS and<br>HERINGTON LIVESTOCK<br>MARKET, INC.,<br><br>            Defendants. | 4:12-CV-3011<br><br>MEMORANDUM AND ORDER |

      This matter is before the Court on defendant William R. Mathias' Motion to Dismiss and/or Motion to Transfer (filing 14). The Court understands Mathias to be moving for dismissal pursuant to Fed. R. Civ. P. 12(b)(2) (lack of personal jurisdiction) and Fed. R. Civ. P. 12(b)(3) (improper venue). And in the alternative, Mathias moves for a change of venue pursuant to 28 U.S.C. § 1404(a). For the reasons stated below, the Court denies all three motions.

I. BACKGROUND

      This is an enforcement action brought for an order of the Department of Agriculture issued pursuant to the Packers and Stockyards Act, 7 U.S.C. § 181 *et seq*. For purposes of these motions, Mathias does not appear to be disputing the underlying facts; therefore, the Court derives the following narrative from the plaintiff's pleadings and evidence, particularly the findings of the Secretary of Agriculture.[1]

      The plaintiff, Roger Wallace, is a cattle feeder in Elkhorn, Nebraska. Filing 1 at 2. Mathias is a resident of Herington, Kansas, and at the time of the events giving rise to this case was a cattle dealer in Herington. Filing 17-1 at 22. The other defendant, Herington Livestock Market (HLM) was a corporation owned and operated by Mathias and his then-wife, based in

---

[1] In enforcement actions such as these, "the findings and orders of the Secretary [of Agriculture] shall be prima facie evidence of the facts therein stated . . . ." 7 U.S.C. § 210(f). The Court views that provision as applicable both to jurisdiction and the merits.

Herington.[2] Filing 17-1 at 22. HLM sold livestock on a commission basis. Filing 17-1 at 22.

Wallace purchased cattle sold by HLM. The middleman for those transactions was Doug Harrington, through Harrington Cattle Company, L.L.C. (collectively, Harrington), based in Lincoln, Nebraska. Filing 17-1 at 23. Harrington had been buying cattle from HLM since HLM started operating in 1990. Filing 17-1 at 23. Beginning in 1996, Harrington had been cleared under Mathias' bond; Harrington had an agreement to pay Mathias 50¢ per head for bonding services, but did not do so. Filing 17-1 at 23. Harrington had also been buying cattle for Wallace at various locations for a number of years. Filing 17-1 at 23.

The trouble began when Harrington bought 67 steers for Wallace from HLM on July 5, 2000. Filing 17-1 at 23. HLM invoiced Harrington for $45,553. Filing 17-1 at 23-24. Harrington, in turn, invoiced Wallace, adding his commission for a total of $45,888. Filing 17-1 at 24. Wallace wired payment to Harrington, who then wrote a check to HLM. Filing 17-1 at 24. But Harrington's check bounced. Filing 17-1 at 24. So, Wallace had paid Harrington for the cattle, but Harrington had not paid HLM. HLM did not inform Wallace at that time. Filing 17-1 at 25. Mathias and his wife each said Harrington had told them that Wallace never paid him. Filing 17-1 at 28.

Harrington bought another 134 steers and 148 heifers for Wallace from HLM on Wednesday, August 2, 2000, for $172,454.50. Filing 17-1 at 24. This time, Wallace mailed a check to HLM directly. Filing 17-1 at 24. (It is not clear why Wallace paid HLM directly on this sale, but not the previous one.) On Monday, August 7, Mathias called Wallace and told him that the check had not arrived. Filing 17-1 at 24. On August 8, Mathias called Wallace again and asked that the money be wired to him, and Wallace wired $172,444.50 (the purchase price minus a wire transfer fee) to HLM. Filing 17-1 at 24.

According to Wallace, Mathias promised he would return Wallace's check after the wire transfer arrived. Filing 17-1 at 29. "'Had they told me they were not going to return my check,'" Wallace said, "'I would never have sent them another wire.'" Filing 17-1 at 29. But instead, on August 9, 2000, Mathias deposited Wallace's check. Filing 17-1 at 24. So, at this point, Wallace had paid for the July 5 cattle, but Harrington had not paid HLM, and Wallace had paid HLM *twice* for the August 2 cattle.

On August 9, 2000, Harrington bought another 65 heifers and 72 steers from HLM for Wallace, for $89,063.40. Filing 17-1 at 24. Harrington invoiced

---

[2] The Court notes Mathias' representation in his motion that after the underlying events, he and his wife divorced, he lost his ownership interest in HLM, and HLM was dissolved. Filing 14 at 2. The Court does not view those facts as being relevant to the current motions.

Wallace on August 10, and Wallace mailed a check directly to HLM on August 12. Filing 17-1 at 24. But on August 15, Wallace's bank informed him that his account was overdrawn. Filing 17-1 at 24. Wallace stopped payment on the check for the August 9 cattle. Filing 17-1 at 24. On the same day, Wallace received a wire transfer from HLM in the amount of $37,830.60. Filing 17-1 at 25. That amount, according to Mathias, represented what Wallace was due back after payment for the July 5 and August 9 cattle had been subtracted. Filing 17-1 at 25. (There seems to be a $2.50 discrepancy that is immaterial at this point.) Mathias only informed Wallace of the insufficient fund check he had received from Harrington after the wire transfer and check for the August 2 cattle had both cleared. Filing 17-1 at 25.

So, at this point, HLM had received all the money it was due for all of the purchases. (Whether it received that money from the right party is the underlying issue in this case.) But, Wallace had paid for the July 5, 2000 cattle twice: once to Harrington, and once to HLM directly through its deduction from his overpayment for the August 2 cattle. Wallace did receive $10,000 from Harrington as a partial payment of the balance on the July 5 cattle. Filing 17-1 at 25. But that left $35,550.50 remaining. Harrington's debts were discharged in bankruptcy; he was not a party before the Department of Agriculture, nor is he a party here. Filing 17-1 at 21.

The Packers and Stockyards Act prohibits every "unjust, unreasonable, or discriminatory regulation or practice" in respect to the furnishing of stockyard services. 7 U.S.C. § 208(a). And any person complaining of anything done in violation of the Act may petition the Secretary of Agriculture, who may then investigate the matter complained of. 7 U.S.C. § 210(a). If after a hearing on a complaint the Secretary determines that the complainant is entitled to an award of damages, the Secretary shall make an order directing the defendant to pay the complainant the sum to which he or she is entitled. 7 U.S.C. § 210(e). In this case, Wallace filed a timely petition, alleging that HLM and Mathias had engaged in an unjust and unreasonable practice within the meaning of the Act. Filing 17-1 at 20; *see, Rice v. Wilcox, 630 F.2d 586 (8th Cir. 1980)*; *Rowse v. Platte Valley Livestock, Inc., 597 F. Supp. 1055 (D. Neb. 1984)*.

A hearing was held on February 10, 2005, in Kansas City, Missouri. Filing 17-1 at 21. The hearing officer found for Wallace. Given that Harrington was out of the picture, the issue was who should bear the burden of his wrongdoing. The hearing officer reasoned that U.C.C. § 2-403 was applicable.[3] Filing 17-1 at 31. Under that section, a person with voidable title

---

[3] The hearing officer did not decide any choice of law question, observing that Nebraska and Kansas law are substantially identical on this point. Filing 17-1 at 31; c*ompare*, Kan. Stat.

has power to transfer a good title to a good faith purchaser for value. Neb. U.C.C. § 2-403(1). When goods have been delivered under a transaction of purchase, the purchaser has such power even though the delivery was in exchange for a check which was later dishonored. Neb. U.C.C. § 2-403(1)(b). And any entrusting of possession of goods to a merchant who deals in goods of that kind gives him or her power to transfer all rights of the entruster to a buyer in the ordinary course of business. Neb. U.C.C. § 2-403(2).

So, the hearing officer found that with respect to the July 5, 2000, transaction, Harrington—who dealt in cattle—had ordered cattle from HLM. Filing 17-1 at 32. HLM shipped the cattle and invoiced Harrington. Filing 17-1 at 32. Harrington paid HLM by check. Filing 17-1 at 32. HLM's shipment of the cattle was, the hearing officer reasoned, entrusting the goods to Harrington, so Harrington could convey good title to Wallace. Filing 17-1 at 32. And Wallace was a buyer in the ordinary course of business. Filing 17-1 at 33; *see* Neb. U.C.C. 1-201(9). The primary issue contested at the hearing was whether Harrington was actually an agent of Wallace (which would make Wallace responsible for Harrington's failure to pay); the hearing officer found that under the facts, he was not. Filing 17-1 at 38.

In sum, Wallace had paid Harrington for the July 5, 2000, cattle and acquired good title. And Wallace had an agreement with HLM not to negotiate the check sent for the August 2 cattle, the consideration for which was a wire transfer of money. Filing 17-1 at 29. HLM had breached that agreement by cashing the check, and had refused to return all the money, based on an invalid claim against Wallace. Filing 17-1 at 29. So, HLM's "offset" against the overpayment for the August 2 cattle was not legitimate. Filing 17-1 at 41. The hearing officer, on behalf of the Secretary, ordered Mathias and HLM to repay Wallace.[4] A petition for reargument was filed, but in a decision filed December 16, 2011,[5] the hearing officer reaffirmed the earlier findings and order. Filing 17-1 at 56.

When a defendant does not comply with an order for the payment of money under the Act, the complainant may, within 1 year, file a petition "in the district court of the United States for the district in which he resides or in which is located the principal place of business of the defendant" setting forth his or her claim, and the order of the Secretary. 7 U.S.C. § 210(f). "Such suit in the district court shall proceed in all respects like other civil suits for

---

Ann. § 84-2-403; Neb. U.C.C. § 2-403. For convenience, the Court will simply cite to the Nebraska statute.

[4] The hearing officer found that Mathias and HLM had joint identity. Filing 17-1 at 26.

[5] The record does not reveal why it took the Department of Agriculture, in the end, nearly 7 years to issue a final resolution of Wallace's claim. This Court hopes to do better.

damages except that the findings and orders of the Secretary shall be prima facie evidence of the facts therein stated . . . ." *Id.* Wallace has timely filed a petition for enforcement in this Court. Filing 1.

## II. ANALYSIS
### 1. PERSONAL JURISDICTION

Mathias contends that Wallace's petition should be dismissed pursuant to Fed. R. Civ. P. 12(b)(2) because haling Mathias to court in Nebraska would deny him due process. Mathias relies on the familiar 14th Amendment minimum contacts analysis of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny. There is, however, an initial question as to whether those 14th Amendment standards apply in this case. Ultimately, the Court concludes that they do. But getting there will take some explaining.

(a) Personal Jurisdiction When a Federal Claim is Asserted

The easiest place to begin explaining is probably with the ~~U.S.~~ Supreme Court's opinion in *Omni Capital Int'l, LTD. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987). In *Omni Capital*, a foreign company and citizen were haled into court in the U.S. District Court for the District of Louisiana by two investment companies that were being sued under the federal Commodity Exchange Act. The issue was how personal jurisdiction over the foreign respondents could be established in federal question litigation. The Court agreed with the investment companies that in a federal question case, the relevant constitutional limits on a federal district court's power to exercise personal jurisdiction flow from the due process clause of the 5th Amendment, not the 14th Amendment. But to exercise personal jurisdiction, "[t]here also must be a basis for the defendant's amenability to service of summons." *Omni Capital*, 484 U.S. at 104.

The Court found no authorization to serve summons in that case. At that time, Fed. R. Civ. P. 4 provided for service of process outside the state in which the district court was held only where a federal statute authorized such service, or under the state long-arm statute. In *Omni Capital*, it was conceded that the requirements of the Louisiana long-arm statute were not met, and the Court concluded that the Commodity Exchange Act did not provide for nationwide service of process. So, the Court concluded, there was no way for the investment companies to serve process in that case, and therefore no personal jurisdiction over the respondents. *Omni Capital, supra*. The Court noted the hardship that imposed, but suggested that any solution would have to come from Congress. *See id*.

The response was Fed. R. Civ. P. 4(k), enacted in 1993. Rule 4(k)(1) now provides, as relevant, that serving a summons or filing a waiver of service

establishes personal jurisdiction over a defendant, "(A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located;" or "(C) when authorized by a federal statute."[6] And for a claim that arises under federal law, Rule 4(k)(2) now provides that serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the U.S. Constitution and laws.

Rule 4(k)(2) obviously closed the gap at issue in *Omni Capital*, by which a defendant who was subject to the jurisdiction of the United States, but not any particular state, could escape service of process. Instead, process can be served on such defendants pursuant to Rule 4(k)(2), subject to the due process clause of the 5th Amendment. *See Chew v. Dietrich*, 143 F.3d 24 (2d Cir. 1998). But this is not a Rule 4(k)(2) case, because Mathias is subject to at least one state's courts of general jurisdiction: Kansas. So, jurisdiction in Nebraska, if it exists, must be based on Rule 4(k)(1).

Rule 4(k)(1)(C) permits jurisdiction to be established by serving a summons or filing a waiver when authorized by a federal statute. And in such instances—when nationwide service of process is *expressly* authorized by a federal statute—jurisdiction is again limited by the due process clause of the 5th Amendment, not the 14th Amendment. *See Omni Capital, supra*; *see also, e.g., In re Auto. Refinishing Paint Antitrust Litigation*, 358 F.3d 288 (3d Cir. 2004) (collecting cases). Then, due process of law requires only that the defendant has sufficient contacts with the *United States*, not the state in which the district court is held. *In re Federal Fountain, Inc.*, 165 F.3d 600 (8th Cir. 1999); *Admin. Comm. of Wal-Mart Stores, Inc. Assocs' Health and Welfare Plan v. Soles*, 204 F. Supp. 2d 1184 (W.D. Ark. 2002); *see also, e.g., Paint Antitrust Litigation, supra*. This is because due process of law relates to the fairness of the exercise of power by a particular sovereign, and individual liberty interests are not threatened when a federal district court sitting pursuant to federal question jurisdiction exercises personal jurisdiction over a defendant who has minimum contacts with the United States. *Soles, supra; see also Federal Fountain, supra*. Any inconvenience to the defendant associated with a particular forum can be addressed as a matter of venue. *See Federal Fountain, supra*.

But contrary to Wallace's argument, service of process is not authorized by a federal statute in this case, so Rule (4)(k)(1)(C) is not in play. Wallace relies upon 7 U.S.C. § 210(f) which, as noted above, permits a complainant under the Packers and Stockyards Act to bring a petition in the home court of

---

[6] Rule (4)(k)(1)(B) deals with joinder and impleader, and is not pertinent here.

either the complainant or the defendant. But that is clearly a venue provision, and does not discuss service of process. As the Supreme Court stated in *Omni Capital, supra,* 484 U.S. at 411, "Congress knows how to authorize nationwide service of process when it wants to provide for it. That Congress failed to do so here argues forcefully that such authorization was not its intention." *See, Dynegy Midstream Servs. v. Trammochem,* 451 F.3d 89 (2d Cir. 2006); *U.S. v. 51 Pieces of Real Property,* 17 F.3d 1306 (10th Cir. 1994), *superseded by statute,* 28 U.S.C. § 1355, *as recognized in U.S. v. One 1978 Piper Cherokee Aircraft,* 91 F.3d 1204 (9th Cir. 1996); *United States v. Contents of Accounts Nos. 3034504504 and 144-07143,* 971 F.2d 974 (3d Cir. 1992) (same). And this is not an instance in which the statute would lose all practical effect unless authorization for service of process was implied. *See, Dynegy, supra; Contents of Accounts, supra; compare U.S. Int'l Trade Com'n v. ASAT, Inc.,* 411 F.3d 245 (D.C. Cir. 2005).

In short, the Court declines to read 7 U.S.C. § 210(f) as authorizing extrajurisdictional service of process in the absence of clear language to that effect. So, that takes us back to Rule 4(k)(1)(A), which permits service of summons or filing a waiver of service to establish personal jurisdiction over a defendant who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located. And that, in turn, takes us back to the 14th Amendment, because whether an out-of-state defendant is subject to the jurisdiction of a state court is subject to (1) the state long-arm statute, and (2) the demands of the 14th Amendment's due process clause. *See, uBid, Inc. v. GoDaddy Grp.,* 623 F.3d 421 (7th Cir. 2010); *Dudnikov v. Chalk and Vermilion Fine Arts, Inc.,* 514 F.3d 1063 (10th Cir. 2008); *Grand River Enters. Six Nations, Ltd. v. Pryor,* 425 F.3d 158 (2d Cir. 2005); *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.,* 148 F.3d 1355 (Fed. Cir. 1998).

The Court recognizes some limited authority for the argument that even where service is made under the forum state's long-arm statute, a federal court may exercise personal jurisdiction as long as such exercise is consistent with a 5th Amendment due process standard. *See Chew, supra,* 143 F.3d at 27 n.3. The Court rejects that view for three reasons. First, it is unsupported by the weight of authority cited above. Second, it is not at all clear what differences a 5th Amendment analysis of state long-arm jurisdiction might entail, and the Eighth Circuit has suggested that the analyses might be the same. *See Dakota Indus. v. Dakota Sportswear, Inc.,* 946 F.2d 1384 (8th Cir. 1991), *but cf. Federal Fountain, supra.* There is no reason to jettison the familiar rubric of *International Shoe* for something new.

And third—and most importantly—the *International Shoe* standards are far more consistent with the plain language of Rule 4(k)(1)(A). Whether a defendant is "subject to the jurisdiction of a court of general jurisdiction" in a

state depends on the state's long-arm statute and whether the defendant has submitted to the state'sسovereign power through purposeful availment of the privilege of conducting activities within the forum. *See J. McIntyre Machinery, Ltd. v. Nicastro, 131 S. Ct. 2780 (2011)*. Simply put, Rule 4(k)(1)(A), when read literally, incorporates the 14th Amendment's limitation on state jurisdiction.

In sum: because this is a federal question case, the constitutional limitation on the Court's personal jurisdiction is imposed by the 5th Amendment due process clause, not the 14th Amendment. But service of process is also necessary to establish personal jurisdiction. See *Omni Capital, supra*. In this case, the only basis for serving process is Rule 4(k)(1)(A). And that rule incorporates the state long-arm statute and the limitations imposed on state jurisdiction by the 14th Amendment due process clause, under *International Shoe* and its progeny. So, it is to application of the Nebraska long-arm statute and *International Shoe* that the Court turns.

(b) Long-Arm Statute/Purposeful Availment

The Nebraska long-arm statute provides, in relevant part, that a Nebraska court may exercise personal jurisdiction over a person as to a cause of action arising from the person contracting to supply services or things in Nebraska, or who has any other contact with or maintains any other relation to Nebraska to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States. Neb. Rev. Stat. §§ 25-536(1)(b) and 25-536(2). Mathias argues that the long-arm statute does not apply to him, in part because the cattle eventually sold to Wallace were physically purchased in Kansas. But Mathias is subject to § 25-536(1)(b) for two reasons. First, the terms of the July 5, 2000, purchase involved shipping the cattle to Wallace in Nebraska, i.e., "contracting to supply . . . things" in Nebraska. And second, Wallace's cause of action arises in part from the August 2 purchase, in which Mathias sent the cattle to Nebraska, and Wallace sent payment to Mathias from Nebraska. These transactions are sufficient to establish jurisdiction under § 25-536(1)(b). *See Kugler Co. v. Growth Prods. Ltd.*, 658 N.W.2d 40 (Neb. 2003).

And in any event, § 25-536(2) expressly extends Nebraska's jurisdiction over nonresidents to the extent the U.S. Constitution permits. *See*, *Stanton v. St. Jude Medical, Inc.*, 340 F.3d 690 (8th Cir. 2003); *Oriental Trading Co. v. Firetti*, 236 F.3d 938 (8th Cir. 2001); *Kugler Co., supra*. Therefore, the inquiries under the long-arm statute and 14th Amendment are merged, and the key question becomes whether the exercise of personal jurisdiction would comport with 14th Amendment due process. *Stanton, supra; Oriental Trading, supra*.

When jurisdiction is challenged on a pretrial motion to dismiss, the plaintiff need only make a prima facie showing of jurisdiction. *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741 (8th Cir. 2011); *Miller v. Nippon Carbon Co.*, 528 F.3d 1087 (8th Cir. 2008). The evidence is viewed in the light most favorable to the plaintiff. *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589 (8th Cir. 2011). Nonetheless, if the defendant controverts or denies jurisdiction, the plaintiff still carries the burden of proof. *See, id.; Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515 (8th Cir. 2010); *Miller, supra*. The plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and opposition thereto. *Miller, supra; Coen v. Coen*, 509 F.3d 900 (8th Cir. 2007).

In order to satisfy the due process clause, a defendant must have minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Pangaea, supra*. The fundamental inquiry is whether the defendant has purposefully availed itself of the benefits and protections of the forum state to such a degree that it should reasonably anticipate being haled into court there. *Viasystems, supra*. Purposeful availment is required to ensure that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or the unilateral activity of another party or a third person. *Stanton, supra*. Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum state. *Id*.

The minimum contacts necessary for due process may be the basis for either "general" or "specific" jurisdiction. *Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010). A court obtains general jurisdiction against a defendant who has "continuous and systematic" contacts with the forum state, even if the injuries at issue in the lawsuit did not arise out of the defendant's activities directed at the forum. *Id*. Specific jurisdiction over a defendant, on the other hand, is exercised when a state asserts personal jurisdiction over a nonresident defendant that has purposefully availed itself of the privilege of conducting business in the forum in a suit arising out of or related to the defendant's contacts with the forum. *See, Pangaea, supra; Johnson, supra*.

The Eighth Circuit has set forth a five-part test for measuring a defendant's contacts with a forum state: (1) the nature and quality of the contacts with the forum state, (2) the quantity of those contacts, (3) the relation of the cause of action to the contacts, (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience of the parties. *Wells Dairy, supra*. The third factor distinguishes whether the jurisdiction is general or specific. *Johnson, supra*. The first three factors are

primary factors, and the remaining two are secondary. *Id*. And a court is to look at all the factors in the aggregate and examine the totality of the circumstances in determining personal jurisdiction. *Id*.

Although it is not entirely clear, Wallace does not appear to contend that there is a basis for finding general jurisdiction in this case; therefore, the Court considers whether specific jurisdiction exists over Mathias. *See, Miller, supra; Coen, supra*. In doing so, the Court considers the nature and quality of Mathias' contacts with Nebraska, and their source and connection to Wallace's cause of action. *See Miller, supra*.

Mathias' argument is simple: he alleges that he is a Kansas resident, doing business in Kansas, and has no connection to Nebraska. He has no office in Nebraska; the sales at issue took place in at his business in Herington. And Mathias asserts that it would be inconvenient for him to defend in Nebraska. Filing 14 at 1-2.

Wallace, on the other hand, points out that the cattle were purchased by Wallace, a resident of Nebraska, by and through Harrington, also a resident of Nebraska. And Mathias had a long history of dealing with both Wallace and Harrington, as described in more detail above. *See* filing 16 at 7-8. The cattle were shipped to Nebraska, and payment sent from Nebraska. Filing 16 at 8-9. And Wallace presents evidence that Mathias repeatedly advertised in a publication called "Grass and Grain," an agriculturally focused newspaper published in central Kansas, but whose publication area reached into southern Nebraska.[7] *See* filing 17-1 at 5-19.

Standing alone, Mathias' business dealings with Harrington and Wallace present a questionable basis for exercising jurisdiction. The use of such arteries as interstate mail, telephone, railway, and banking facilities are insufficient, standing alone, to satisfy due process. *Wells Dairy, supra*. But personal jurisdiction may also be asserted over nonresident defendants whose acts are performed for the very purpose of having their consequences felt in the forum state. *Johnson, supra; Coen, supra*. This "effects" test, based in *Calder v. Jones, 465 U.S. 783 (1984)*, provides that a defendant's extraterritorial tortious acts can serve as a source of personal jurisdiction where the plaintiff makes a prima facie showing that the defendant's acts (1)

---

[7] The Court notes that none of the advertisements adduced by Wallace seem to have been published at or before the time of the underlying events, or commencement of the administrative action. And the rule is that minimum contacts must exist either at the time the cause of action arose, the time the suit is filed, or within a reasonable period of time immediately prior to the filing of the lawsuit. *Steinbuch v. Cutler, 518 F.3d 580 (8th Cir. 2008)*. The Court does not view the "Grass and Grain" publications to be particularly dispositive, however, and need not resolve whether the timing of their publication bears on their relevance to the minimum contacts analysis.

were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—in the forum state. *Viasystems, supra*; *Johnson, supra*.[8]

The effects test is satisfied here, by Mathias' conduct in soliciting a wire transfer from Wallace, then negotiating Wallace's check after having agreed not to. Although that conduct was primarily evaluated by the Department of Agriculture through the lens of contract law and the Uniform Commercial Code, it was to support the conclusion that Mathias had engaged in an "unjust [or] unreasonable . . . practice" in violation of 7 U.S.C. 208(a).[9] In short, Mathias' acts (1) were intentional, (2) were uniquely aimed at Wallace in Nebraska, and (3) caused harm to Wallace, that Mathias knew was likely to be suffered in Nebraska.

The Eighth Circuit's decision in *Oriental Trading, supra*, is instructive. In *Oriental Trading*, a Virginia resident approached Oriental Trading Co. on behalf of Global Marketing Group, Inc., a Virginia corporation that sold pencils and crayons. Oriental Trading is a Nebraska corporation in the business of selling goods made in Asia. Global sent Oriental Trading a price list, and Oriental Trading eventually entered into two contracts with Global for the sale of a certain number of pencils and crayons at an established price. *See id*.

Then Global made a new offer. Its officer told Oriental Trading that the U.S. Customs Service was contemplating imposing additional duties on pencils made in certain Chinese factories. Global suggested that it could become the importer of record so it could switch factories and lower the cost of the additional Customs duties. Global promised to deal directly with Customs, pay all the duties, and simply bill Oriental Trading for them. Global sent invoices to Oriental Trading that included $360,886.32 in duties, telling Oriental Trading that this reflected the amount of money that was being deposited with Customs so that Oriental Trading's goods could be

---

[8] This test does not supplant the five-part test set forth above; rather, the effects test simply provides an additional factor to consider when evaluating a defendant's relevant contacts with the forum state. See *Johnson, supra*. In any event, the five-factor test "'is not to be mechanically applied.'" *Pangaea, supra,* 647 F.3d at 746 n.4.

[9] The Court notes some controversy over whether *Calder* simply requires an intentional act, or whether that intentional act must be tortious or "wrongful." *See Dudnikov, supra*, citing *Yahoo! Inc. v. La Ligue Contre le Racisme Et L'Antisemitisme,* 433 F.3d 1199 (9th Cir. 2006) (*en banc*). The Court need not resolve that issue here, because even if *Calder* requires some form of "wrongful" conduct, the Court is persuaded that a violation of 7 U.S.C. § 208(a) would comply. *See Dudnikov, supra*.

- 11 -

released. Oriental Trading paid by bank transfer. But Global simply deposited the funds and used them for normal operating expenses. *See id*.

Eventually, Customs decided not to impose any additional duties, and Oriental Trading contacted Global to inquire about a refund. Global promised to get back to Oriental Trading, but never did, and none of the money was ever returned. Global took the position that it had a right to retain the money even if it was not used for Customs duties. Not surprisingly, Oriental Trading sued Global, in Nebraska, and after Global was dissolved, Oriental Trading sued its directors and officers, again in Nebraska. The defendants moved to dismiss for lack of personal jurisdiction, but the district court overruled their motion, and Oriental Trading prevailed at a jury trial. *See id*.

On appeal, the Eighth Circuit affirmed the district court's decision. The defendants argued that they did not have minimum contacts with Nebraska because they never entered the state and only made phone calls and faxes into Nebraska. But, the Eighth Circuit noted, "[t]he lack of physical presence in a state cannot alone defeat jurisdiction." *Id.* at 943. And the litigation, the court found, arose out of "what the jury found to be [the defendants'] intentional tortious acts directed at residents of Nebraska where the brunt of the harm was felt." *Id.*, *citing Calder, supra*. The Eighth Circuit reasoned that the defendants had initiated a business relationship with Oriental Trading and negotiated contracts with Global. They had contacted Oriental Trading in Nebraska and proposed the mechanism by which Oriental Trading would forward funds to Global, supposedly for Customs duties. Their contacts with Nebraska were meant to implement that scheme. "By purposely directing their fraudulent communications at residents of Nebraska," the Eighth Circuit concluded, "the defendants should have realized that the brunt of the harm would be felt there, and they should have reasonably anticipated being haled into court there." *Id*. (citations omitted).

The same principles apply in this case. Mathias established a long-standing business relationship with two Nebraska residents, Harrington and Wallace. Then, so far as the evidence currently before the Court on these motions would indicate, he reached into Nebraska, to Wallace, and solicited a double payment as "self-help" (perhaps under false pretenses) after Harrington's check for a previous transaction was dishonored. Then, according to the current record, he wrongfully retained part of the proceeds—an unjust or unreasonable practice in violation of the Packers and Stockyards Act. He should not have been surprised to be sued in Nebraska.

That conduct weighs heavily in favor of finding that Mathias purposefully availed himself of the privilege of doing business in Nebraska, when the nature and quality of Mathias' contacts with Nebraska are considered, along with the relation of Wallace's cause of action with those

contacts. *See Wells Dairy, supra*. And Nebraska obviously has a strong interest in providing a forum for its residents when they suffer the effects of intentional, wrongful acts in Nebraska. *See id*. Mathias' bare assertion that it is inconvenient for him to defend in Nebraska does not outweigh those factors, when they are considered in the aggregate, and the totality of the circumstances is examined. *See Johnson, supra*.

In short, the Court finds that personal jurisdiction over Mathias is proper in Nebraska. Mathias' Rule 12(b)(2) motion will be denied.

## 2. VENUE

In the alternative, Mathias makes two arguments with respect to venue. The first is that venue is improper under 28 U.S.C. § 1391, the general venue statute. The Court construes this as a motion to dismiss pursuant to Rule 12(b)(3). But Mathias' argument is quickly disposed of.

28 U.S.C. § 1391 provides that:

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, *except as otherwise provided by law*, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

(Emphasis supplied.) The key words are "except as otherwise provided by law" because, as explained above, the Packers and Stockyards Act provides for venue in the district in which the complainant resides—in this case, Nebraska. *See* 7 U.S.C. § 210(f). Therefore, venue in Nebraska is not improper, and Mathias' Rule 12(b)(3) motion will be denied.

Mathias also moves for a change of venue pursuant to 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." Mathias seeks transfer to Kansas.

But the Eighth Circuit has explained that, in general, federal courts give considerable deference to a plaintiff's choice of forum; therefore, the party seeking a transfer under 28 U.S.C. § 1404(a) typically bears the burden of proving that a transfer is warranted. *In re Apple, Inc.*, 602 F.3d 909 (8th Cir. 2010). And a transfer motion requires the court to consider the

convenience of the parties, the convenience of the witnesses, the interests of justice, and any other relevant factors when comparing alternative venues. *Terra Intern., Inc. v. Miss. Chem. Corp.*, 119 F.3d 688 (8th Cir. 1997).

There is very little presented here to support Mathias' motion to transfer. He simply asserts that defending in Nebraska would be inconvenient to him, but does not explain why it would be particularly inconvenient. And presumably, litigating in Kansas would be at least equally inconvenient to Wallace. There is little in the record at this point to establish what other proceedings may be necessary. When the relevant factors are considered, *see Terra Intern., supra*, the record is insufficient for Mathias to carry his burden of proving that transfer is warranted. *See Apple, supra*. Therefore, his 28 U.S.C. § 1404(a) motion will also be denied.

### III. CONCLUSION

For the foregoing reasons, the Court finds that personal jurisdiction and venue are appropriate in Nebraska. Accordingly,

IT IS ORDERED:

1. Mathias' Fed. R. Civ. P. 12(b)(2) motion is denied.

2. Mathias' Fed. R. Civ. P. 12(b)(3) motion is denied.

3. Mathias' 28 U.S.C. § 1404(a) motion is denied.

Dated this 17th day of May, 2012.

BY THE COURT:

John M. Gerrard
United States District Judge